UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PACIFIC INSURANCE COMPANY, et al.,<br><br>    Plaintiffs,<br><br>  vs.<br><br>CATHOLIC BISHOP OF SPOKANE, et al.,<br><br>    Defendants. | No. CV-05-0075-JLQ<br><br>MEMORANDUM OPINION AND ORDER **DENYING** (1) OREGON AUTO'S MOTION FOR SUMMARY JUDGMENT BASED ON NO "ACCIDENT" AND (2) CNA'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALL CHILD SEXUAL ABUSE CLAIMS AGAINST THE DIOCESE OF SPOKANE INVOLVING PATRICK O'DONNELL BASED ON NO "ACCIDENT" |

BEFORE THE COURT are two summary judgment motions: (1) Cross-Defendant Oregon Auto's Motion For Summary Judgment Based On No "Accident" (Ct. Rec. 138), and (2) Plaintiff Pacific Insurance Company's Motion for Partial Summary Judgment on All Child Sexual Abuse Claims Against the Diocese of Spokane Involving Patrick O'Donnell Based On No "Accident" (Ct. Rec. 155). Oral argument was heard on both motions on March 20, 2006. **Jed W. Morris** and **Diane L. Polscer** represented the Cross-Defendant, Oregon Auto Insurance Company (hereinafter "Oregon Auto"). **Philip C. Stahl**, **Matthew O. Sitzer**, and **Elizabeth Kennar** represented the Plaintiff, Pacific Insurance Company (hereinafter "CNA"). **James R. Murray** and **Gregory J. Arpin**

represented the Cross-Claimant, Catholic Bishop of Spokane (hereinafter "Diocese").

INTRODUCTION

With its summary judgment motion, Oregon Auto seeks a declaration that the alleged negligence of the Diocese in connection with the alleged sexual abuse by Diocesan priests is not an "accident" under Washington law, and Oregon Auto therefore has no duty to defend or indemnify the Diocese under the policies at issue in this action. Oregon Auto argues that whether there was an "accident" is an objective determination and because the incidents which caused the injury – the alleged acts of sexual abuse by Diocesan priests – are not "accidents" as a matter of law, there is no coverage for such acts for the perpetrator priests, nor for the co-insured Diocese for the claims of negligent hiring, supervision, or retention of such priests. If successful in its motion, Oregon Auto asks that the Diocese's coverage cross-claims be dismissed with prejudice and without costs.

The Diocese objects to Oregon Auto's motion explaining that it "seeks coverage only for the claims asserting that the Diocese acted negligently with respect to its hiring and oversight of the priests who committed sexual abuse," not "for the claims directly against the priests for their sexual abuse or for those claims against the Diocese based on respondeat superior liability." (Ct. Rec. 144, p. 5) (emphasis in original). The Diocese states that it has never disputed that coverage would be unavailable to the individual priests for their acts of sexual abuse. (Ct. Rec. 144, pg. 10). Instead, the Diocese argues

that the real issue of coverage is whether the Diocese's alleged acts of negligent hiring and supervision constitute "occurrences."

After Oregon Auto's motion was filed, CNA filed a motion for partial summary judgment seeking a ruling from the court that CNA has no duty to defend or indemnify the Diocese under CNA's policies for claims arising out of alleged sexual abuse perpetrated by Patrick O'Donnell (hereinafter "O'Donnell").  CNA argues that there is no genuine issue of material fact that each of the Diocese's supervisory acts concerning O'Donnell were deliberate and therefore did not constitute an "accident."  If successful in its motion, CNA asks that the Diocese's coverage cross-claims be dismissed with prejudice and without costs.   In response, the Diocese argues that although its acts can be characterized as  volitional, the alleged acts of negligence, of which it is accused, were unintentional and unexpected.

As Oregon Auto and CNA are the parties moving for summary judgment, the evidence and inferences therefrom are viewed in the light most favorable to the Diocese. The facts are undisputed except where otherwise stated.

## BACKGROUND

Inherited from 19th century English common law, the majority of United States courts had a long history of court and statutory rulings immunizing  eleemosynary, charitable, and religious organizations from judgments against them by reason of alleged tortious conduct by it or its agents.  The theory behind such immunity included a concern

that donors to such institutions needed assurance that their donated monies would be used for the charitable and religious purposes for which it was intended, rather than for legal damages to claimants against such institutions.  By 1938, at least forty of the then forty-eight states had adopted some form of charitable institution immunity.  Victor E. Schwartz & Leah Lorber, *Defining the Duty of Religious Institutions to Protect Others: Surgical Instruments, Not Machetes, Are Required*, 74 U. CIN. L. REV. 11, 13 (2005). Included in those forty states was the state of Washington which, commencing in 1895, recognized such immunity.  *Richardson v. Carbon Hill Coal Co.*, 10 Wash. 648, 655-56 (1895). The *Richardson* opinion and its progeny relied upon the public policy reasoning that because funds donated to charities were held in trust for the purposes for which they were contributed, these funds should not be used to pay for damages arising from the negligence of the trustee or its agents.

The charitable immunity rule continued in the state of Washington for almost 70 years despite many state and federal statutory and caselaw actions doing away with it. The lead case in such challenges was authored by then Judge (later Justice) Rutledge in *President and Dirs. of Georgetown Coll. v. Hughes,* 130 F. 2d 810 (D.C. Cir. 1942). Judge Rutledge stated in part that:

> The rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them.

*Id.* at 827.

Despite the abrogation of charitable immunity in the *Georgetown College* opinion,
many courts and legislatures, including those of the state of Washington, resisted ongoing
efforts by claimants and their attorneys to have charitable immunity overturned.  The
state of Washington was one of the last to overrule such immunity and it was not until the
year 1964 that the Supreme Court of this state did so in *Friend v. Cove Methodist
Church*, 65 Wash. 2d 174, 178-79 (1964).  One of the reasons given by the court in the
*Cove Methodist* opinion abrogating the immunity rule was that "liability insurance is
available at reasonable cost." *Id* at 176.  Following the landmark *Cove Methodist*
decision, most charitable institutions, including the Diocese of Spokane, commenced and
continued the purchase of comprehensive liability policies such as those herein involved.

According to the Diocese, it purchased general liability coverage policies CP
10500 and CP 16200 from Oregon Auto, which provided coverage from February 1,
1972, until February 1, 1976.  (Oregon Auto St. Fact ¶ 1; Diocese St. Fact ¶ 3).  The
Diocese asserts that these policies covered "the Diocese and all priests for auto, premises
and personal activities, with liability limits of $200,000/$1,000,000 for bodily injury."
(Diocese St. Fact ¶ 3).  However, the submitted documents only refer to "comprehensive
liability coverage for the parish and all Priests . . ." (Ex. V, p. 245, 257, 259, 261).  On
the face of the documents, it is unclear to which parish or parishes or priests they might
apply.  The Diocese asserts that "secondary evidence confirms that the 'Catholic Bishop
of Spokane' . . . is the named insured on the policies." (Diocese St. Fact ¶ 3).  That

"secondary evidence," however, consists of correspondence and automobile insurance forms that do not specifically refer to general liability insurance.  (Ex. V, p. 255, 256, 258, 260).

During discovery, the Diocese produced exemplar forms used by Oregon Auto from 1971 through 1976, which were approved for use in Washington by the Washington State Insurance Commissioner, (Diocese St. Fact ¶ 4), and, according to the Diocese, evidence the contents of the policies the Diocese allegedly held. (Oregon Auto St. Fact ¶ 2).  The forms provide that Oregon Auto is obligated "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damages to which this insurance applies, caused by an occurrence . . ." (Brann Aff. ¶ 2).  Depending on the year the policy was issued, "occurrence" is defined as either "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured," or "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  (Brann. Aff. ¶ 2).

According to the Diocese, it tendered claims for coverage to Oregon Auto based on the negligence claims asserted against it by the tort litigants, for which the insurance carriers have been providing defenses, subject to a reservation of rights.  (Diocese St.

Fact ¶ 7, Arpin Dec. ¶ 7). Between October 2002 and December 2004, when the Diocese filed its bankruptcy action, twenty-one complaints, involving sixty-four claimants, had been filed against the Diocese. Each complaint contained some sort of negligence claim against the Diocese for allegedly failing to properly supervise the abusive priests. (Diocese St. Fact ¶ 1). Additionally, thirteen of the twenty-one complaints included separate intentional tort claims against one or more priests. (*Id.* at ¶ 2). Some of these complaints pertain to periods not covered by Oregon Auto and are not relevant to this motion. (Oregon Auto Reply St. Fact, p. 4-5).

The Diocese alleges that it purchased general liability insurance policy CBP 907065 from Pacific Insurance Company, a CNA company, which provided coverage from February 1, 1976 until February 1, 1977, and purchased general liability policy IP 04060136 from American Casualty Company, another CNA company, which provided coverage from February 1, 1979 until February 1, 1980. (CNA St. Fact ¶¶ 1, 3). These policies have not been located by the parties, but for the purposes of this motion, their existence is assumed by CNA. (CNA Reply St. Fact No. 1-4). The parties have produced general liability policy IP 006514553, which the Diocese purchased from American Casualty Company and provided coverage from February 1, 1980 until February 1, 1981. (CNA St. Fact ¶ 5). Continental Insurance Company, another CNA company, issued general liability insurance policy CBP 905610, which provided coverage from February 1, 1985 until February 1, 1988. (*Id.* at ¶ 7).

The 1980-81 policy provided coverage for "all sums which the *Insured* shall become legally obligated to pay as damages because of . . . *Bodily Injury* . . .which this insurance applies caused by an Occurrence . . ."  (*Id.* at ¶ 6).  The policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in *Bodily Injury* neither expected nor intended from the standpoint of the Insured."  (*Id.*).  The 1985-88 policies included substantially similar coverage language and apparently the Diocese would admit that the 1976-77 and 1979-80 polices do also.  (*Id.* at ¶¶ 8-9).

Seven of the twenty-one tort complaints against the Diocese involve allegations of sexual abuse by Patrick O'Donnell that took place during a CNA policy period.  (*Id.* at ¶ 11).  There are twenty alleged victims claiming abuse during the CNA policy periods, thirteen of which allegedly occurred during the 1976-77 policy period.  (*Id.* at ¶ 20).  Among the tort allegations, many of these complaints similarly claim that the Diocese "knew that O'Donnell was a sexual predator of adolescent and pre-adolescent boys who posed a constant threat to children" and "[d]espite this knowledge, bishops, archbishops and other church officials repeatedly permitted O'Donnell to prey upon unsuspecting children . . ." (*Id.* at ¶¶ 12-15, 17).  Some of the complaints also allege that the Diocese attempted to conceal its knowledge regarding O'Donnell by transferring him to another parish.  (*Id.* at ¶¶ 14-18).  The Diocese states that these actions have been filed against the Diocese and the complaints include allegations of negligence against the Diocese.  The

Diocese has denied those allegations.  (Diocese St. Fact ¶ 5).

O'Donnell was a priest from May 29, 1971, until March 5, 1986.  (CNA St. Fact ¶ 21).  Some of the factual allegations presented by CNA in support of its motion are solely based on O'Donnell's deposition testimony and the Diocese challenges O'Donnell's credibility as a witness because he is an admitted sex offender and a named defendant in all the "O'Donnell claims." (Diocese St. Fact ¶ 10).

O'Donnell was enrolled at St. Thomas Seminary in Kenmore, Washington from 1967 until 1971.  (CNA St. Fact ¶ 21).  According to O'Donnell's 2004 deposition testimony, he first reported  being sexually attracted to adolescent boys to Father Ribble, who was acting as O'Donnell's spiritual director and confessor during O'Donnell's last years of undergraduate education at Gonzaga University, several years prior to entering the seminary.  (O'Donnell 7/7/2004 Dep., p. 23-32).  However, now Monsignor Ribble denies O'Donnell's account.  (Ribble Dec. ¶ 10).  O'Donnell also testified that during his time at St. Thomas Seminary, he told Father Basso, one of his spiritual directors and confessors, that he had engaged in sexual contact with adolescent boys, (O'Donnell 7/7/2004 Dep, p. 43, 46, 53, 82-83, 93-94), and received therapy for his sexual attraction to young boys.  (O'Donnell 7/7/2004 Dep., p.86-88). The Diocese points out, however, that the Diocese was never specifically advised about this therapy, (Diocese St. Fact ¶ 11), and the court notes that Father Ribble and Basso were acting as O'Donnell's spiritual

ORDER - 9                                                    9

directors and confessors during this period and it is not suggested that their alleged

knowledge would be passed on to Diocesan officials.

While at St. Thomas Seminary, the Diocese received reports regarding

O'Donnell's progress and one such report stated that O'Donnell "may well be very

effective as a confessor, especially in youth who he has a special interest," but noted that

he had been "cautioned about an over-interest." (CNA St. Fact ¶ 25). As the Diocese

points out, however, the "over-interest" in youth is not described in terms of a sexual

interest or other terms that might raise alarm. (Diocese St. Fact ¶ 12).

O'Donnell was ordained May 29, 1971 and on August 30, 1971, Bishop Topel

assigned O'Donnell to serve as Assistant Pastor and Assistant Diocesan Director of

Youth at St. Peter's Parish in Spokane. (CNA St. Fact ¶ 27-28). Although not reflected in

the deposition testimony submitted to the court, CNA claims that around this 1971 time-

period , KO, a teenager living in or within the vicinity of Spokane, and his mother, met

with Dan Coyle, a counselor employed by the Spokane Diocese, and reported that he was

sexually abused by O'Donnell. (*Id.* at ¶ 26). While the Diocese does not dispute that KO

may have made these allegations in his deposition, the Diocese points out that Coyle

denies he ever discussed any abuse issues with KO or KO's mother. (Coyle Dep. ¶ 5).

According to Rita Flynn's testimony, Bishop Topel (now deceased) said that he knew of

"Pat's problem" within weeks after O'Donnell's May 19, 1971 ordination. (Flynn Dep.,

ORDER - 10                                                    10

p. 37).

On or about January 6, 1972, O'Donnell was informed, via a letter from Bishop Topel, that the Diocese wanted him to devote his time to youth work in the Spokane area. (CNA St. Fact ¶ 29). On or about April 24, 1972, he was appointed Diocesan Chaplain of the Boy Scouts. (*Id.* at ¶ 30). According to O'Donnell, sometime during 1972, Monsignor John Donnelly, rector of the Bishop White Seminary in Spokane, O'Donnell's residence, handled a situation where a teenage boy who was supposed to stay overnight with O'Donnell left after O'Donnell asked for and then offered to give a back rub. (O'Donnell 8/30/2004 Dep., p. 184-85). Monsigner Donnelly remembered having misgivings about O'Donnell's sexual attraction to teenagers but did not remember expressing those misgivings to the Diocese's officials. (Donnelly Dep., p. 10-11).

To this point, other than O'Donnell's own deposition testimony, the only evidence presented concerning what the Diocese knew concerning O'Donnell's proclivities include the seminarian report vaguely stating that O'Donnell was cautioned about an "over-interest" in youth and the deposition testimony of Rita Flynn regarding her conversation with Bishop Topel.

On August 28, 1973, Bishop Topel transferred O'Donnell to St. Mary's Parish, in Spokane, Washington. (CNA St. Fact ¶ 32). Robert Malloy, a parishioner at St. Mary's, testified that he told Father Abel (now deceased), a priest of the Diocese and pastor of St.

Mary's, that "he had a problem with Father [O'Donnell] . . . because [h]e thought [O'Donnell] might be bothering [his] boys physically, immorally." (Robert Malloy Dep., p. 8-10). Although Robert Malloy could not recall what he said to Father Abel specifically, he thought he told Father Abel what his son Greg had told him, which involved an incident where O'Donnell asked Greg Malloy for a massage while having a visible erection. (Robert Malloy Dep., p. 8-10; Greg Malloy Dep., p. 8-12). After Robert Malloy's alleged conversation with Father Abel, Kathleen Lockie, the principal of St. Mary's Catholic School, testified that she remembers attending a meeting where Father Abel informed her and Cletus Rademacher, the Parish's business manager, that he had received complaints about O'Donnell's sexually inappropriate behavior with children and that he had been informed by parents that O'Donnell was a "pedophile," which Father Abel explained meant "abuse of young men, or young boys." (Lockie Dep., p. 17-24, 59, 62-63). The Diocese will challenge that factual assertion with expert testimony that the term "pedophile" was not part of mainstream vernacular in the early 1970s. (Diocese St. Fact ¶ 21-22).

On May 2, 1974, Father Abel wrote to Father Robert Pearson, a member of the Diocesan Priest Personnel Board concerning reassigning O'Donnell, stating that O'Donnell could remain for another year if "he is able to recognize the problem, which Fr. Gill outlined as a 'pediatrician complex,'" which was having "far reaching

consequences in relation to his ability to function as a priest in a parish." (May 2, 1974 letter from Father Abel to Father Pearson). The Diocese argues that the meaning of the letter is ambiguous, and points out that even Father Pearson, the recipient of the letter, does not now understand the meaning of "pediatrician complex." (Pearson Dep., p. 83). Father Gill, who allegedly used the term "pediatrician complex," was a Jesuit psychiatrist, (*Id.*), who, according to his obituary, "ran workshops on every continent, educating clergy and laypersons alike about human development, sexuality, stress management, and developing one's full potential." (Harvard University Gazette, June 17, 2004). Then, on May 22, 1974, Father Abel wrote a second letter to the Diocesan Priest Personnel Board, asking the board to move O'Donnell to another post immediately because O'Donnell is "very resentful at present and this is fast leaking out to the parishioners through his public statements." (May 22, 1974 letter From Father Abel to Priest Personnel Board).

On August 1, 1974, Bishop Topel wrote a letter to O'Donnell informing him of his appointment as associate pastor to Father Skylstad at Assumption Parish, (CNA St. Fact ¶ 39), and asks him to "obtain the therapy that we discussed." (August 1, 1974 letter from Bishop Topel to O'Donnell). The mention of therapy is not specific, and as the Diocese points out, does not reference "sexual therapy." (Diocese St. Fact ¶ 26). Father Skylstad was later appointed Chancellor of the Diocese and then, much later, Bishop of the

ORDER - 13                                     13

Diocese of Spokane.  (CNA St. Fact ¶ 40).

According to O'Donnell, in 1974, he referred himself to Father Lavoy (now deceased), a psychiatric social worker and fellow priest of the Diocese, to receive therapy related to his sexual attraction to and abuse of adolescent boys, and the therapy continued until 1976.  (O'Donnell 7/7/2004 Dep., p. 127-28).  In 1975, Rita Flynn, an Assumption parishioner reported O'Donnell to Father Skylstad for making members of the track team wash their genitals in front of him.  (Flynn Dep., p. 12-16).  According to her testimony, this incident was shared with Bishop Topel and Father Skylstad allegedly spoke with O'Donnell.  (*Id.*).  Shortly thereafter, Rita Flynn informed Father Skylstad about more inappropriate behavior by O'Donnell.  This time, Flynn told Skylstad that at church retreats the boys would strip down and streak and that according to the boys "everyone knows that O'Donnell has a thing for young boys . . . that he's sexually attracted to them."  (*Id.* at 21-23).  Bishop Skylstad, however, does not recall Rita Flynn making that statement.  (Skylstad Dec.).

In 1976, Rita Flynn and her husband Jim Flynn, reported to Monsignor Donnelly, the new pastor at Assumption Parish, that O'Donnell had molested a boy named PB.  (CNA St. Fact ¶ 47).  Then, according to Flynn, Father Skylstad spoke to PB over the telephone regarding the allegations, (*Id.* at 48), although now Bishop Skylstad does not recall having such a conversation.  (Skylstad Dec. ¶ 7).  Within a few days, Bishop Topel

met with O'Donnell to discuss the PB allegations.  (O'Donnell 7/7/2004 Dep., p. 191).

After several more meetings, Bishop Topel instructed O'Donnell to move to Seattle to

receive psychiatric treatment.  (*Id.* at 195).   The events surrounding the PB allegation are

corroborated by a Diocese's answer to interrogatories from underlying litigation, in

which the Diocese stated:

> Sometime after Msgr. Donnelly became pastor at Assumption Parish, it is
> believed he made a report to the Spokane Diocese that a complaint had been
> made that O'Donnell had sexually molested an adolescent male, believed to
> have been [PB].  Upon that report, O'Donnell was removed by Bishop Topel
> from his assistant pastor position at Assumption Parish and put on leave.
> This occurred in June 1976.  O'Donnell then went to Seattle to undergo
> therapy and counseling.  (*Id.* at 45).

It was reported to the Assumption parishioners that O'Donnell left because he was

granted a sabbatical.  (CNA St. Fact ¶ 45) (*Id.* @ 55).

Between 1976 and 1978, O'Donnell resided at St. Paul's rectory in the

Archdiocese of Seattle.  (CNA St. Fact ¶ 55).  He received psychiatric treatment from

Irwin Dreiblatt and pursued a post-graduate degree in psychology.  (*Id.* at 54).  According

to O'Donnell's deposition testimony, he continued to sexually abuse young boys during

this period.  (O'Donnell 7/7/2004 Dep., p. 9).  According to the Spokane Diocese,

however, it was unaware of these alleged acts of abuse until October 2002.  (Diocese St.

Fact ¶ 43).  During this treatment period, Bishop Topel inquired of Mr. Dreiblatt

regarding O'Donnell's progress, (*Id.* at ¶ 44), but O'Donnell did not recall Bishop Topel

inquiring directly concerning his therapy or progress.  (O'Donnell 7/7/2004 Dep., p. 205-206).

In 1978, O'Donnell returned to Spokane and resided at the Cathedral of Our Lady of Lourdes Parish.  (CNA St. Fact ¶ 61).  The Diocesan newspaper ran an article that only reported that he had been in Seattle to pursue a post-graduate degree.  (*Id.* at ¶ 58).  Upon his return, Rita Flynn met with Bishop Topel to express concern about O'Donnell's contact with boys.  (Flynn Dep., p. 35-37).  This is the same meeting where Bishop Topel allegedly made the before mentioned statement to Flynn about learning of O'Donnell's "problem" within weeks of O'Donnell's ordination.  (*Id.* at 37).

Later in 1978, Lawrence Welsh became Bishop of Spokane, replacing Bishop Topel  (CNA St. Fact ¶ 63).  Shortly thereafter, Bishop Welsh met separately with Father Steiner, Chancellor of the Diocese, and O'Donnell to speak about O'Donnell's history of sexual abuse and Seattle treatment.  (Steiner Dep., p. 116; O'Donnell 8/30/2004 Dep., p. 139, 145-46).  Rita Flynn claims that around this time, she called Bishop Welsh to talk about O'Donnell and that the Bishop told her that he was already fully informed and had met with O'Donnell.  (Flynn Dep., p. 40-42).

In 1979, Bishop Welsh and Father Steiner, Chancellor of the Diocese, met with the Diocesan Priest Personnel Board, which recommended that O'Donnell be assigned to Our Lady of Lourdes Cathedral. (CNA St. Fact ¶ 62).  There was some indication that the

ORDER - 16                                              16

Board did not have a complete picture of O'Donnell's history and this may have been to protect O'Donnell's reputation. (Steiner Dep., p. 118-24). Then, on or about September 4, 1979, O'Donnell was assigned to serve as Pastor of Holy Rosary Parish in Rosalia, Washington. (CNA St. Fact ¶ 66).

In 1980, the parents of two boys allegedly complained to Bishop Welsh that O'Donnell sexually abused their sons while on an outing on Lake Coeur d'Alene, in Idaho. (O'Donnell 7/7/2004 Dep., p. 41, 140). In response to this incident, O'Donnell began therapy with Howard Hake. (CNA St. Fact ¶ 69-70). In January 1983, the Washington State Department of Licensing filed a complaint against O'Donnell regarding the 1980 incident on Lake Coeur d'Alene and on February 24, 1984, restricted his license to practice psychology after finding that he "committed grossly immoral acts and displayed a lack of good moral character." (Washington Department of Licensing Findings of Fact, Conclusions of Law and Order).

On May 29, 1985, the Diocese removed O'Donnell from Holy Rosary Parish, (CNA St. Fact ¶ 73), and reassigned him to serve as Pastor of St. John Vianney Parish. (*Id.* at 74). Although the transfer letter from Bishop Welsh to O'Donnell makes no reference to complaints about inappropriate behavior with children, (May 8, 1985 Transfer Letter from Bishop Welsh to O'Donnell), Father Bach recalled that O'Donnell's removal from Holy Rosary was due to such complaints. (Bach Dep., p. 36-37).

According to O'Donnell, on the other hand, he was transferred because Bishop Welsh had indicated that "I had done a very good job [at Holy Rosary] and he wanted me in a large city parish where he would also have me mentor a newly ordained priest." (Diocese St. Fact ¶ 62).

At St. John Vianney Parish, O'Donnell joined Father Dublinski, who was working as the parochial vicar. Father Dublinski was not informed of O'Donnell's history and did not learn about it until O'Donnell was later removed from the ministry. (Dublinski Dep., p. 69-70, 91). Complaints filed by BN, JW, and LK, allege that O'Donnell abused three boys during 1985. (CNA St. Fact ¶ 78)

On September 21, 1985, Father Pearson wrote a letter to Bishop Welsh concerning O'Donnell. Father Pearson explained that he spoke with Howard Hake, O'Donnell's therapist, and Hake thought that O'Donnells's "pedophiliac condition" was a personality disorder and, as such, may not be totally curable. (September 21, 1985 letter from Father Pearson to Bishop Welsh). Furthermore, Hake thought that setting out expectations regarding O'Donnell's behavior with minors would be helpful. (*Id.*). According to Father Dublinski's testimony, by 1985, O'Donnell's background had become common enough knowledge that parishioners approached Bishop Welsh to request O'Donnnell's removal from ministry. (Dublinski Dep., p. 91-92). On November 14, 1985, O'Donnell was placed on leave from St. John Vianney Parish. (CNA St. Fact ¶ 80). On or about

March 5, 1986, Bishop Welsh placed restrictions on O'Donnell's priestly ministry and withdrew his faculties.  (*Id.* at ¶ 81).

Based upon the foregoing, the Diocese may have been aware of O'Donnell's sexual propensities as early as 1971, the date Rita Flynn testified that Bishop Topel said he first knew of O'Donnell's "problem," or,  in 1974, when Father Able wrote to Father Pearson, a member of the Diocesan Priest Personnel Board, concerning O'Donnell's "pediatrician complex," or, in 1975, when Rita Flynn allegedly conversed with Bishop Topel concerning O'Donnell's inappropriate sexual behavior involving her sons. Regardless, in 1986, when O'Donnell was removed from the ministry, only three complaints had been made directly to the Diocese – (1) Rita Flynn's 1975 complaints regarding the boys track team washing of their genitals and streaking during church retreats, (2) the 1976 incident involving alleged sexual abuse of PB, and (3) the 1980 alleged incident involving two boys on Lake Coeur d'Alene.  After each incident, the Diocese sought therapy for O'Donnell.  However, at no point did the Diocese place any restrictions on his contact with children or disclose his history of sexual abuse, sexually inappropriate behavior, or related therapy to O'Donnell's parishioners.  According to the Diocese's expert, Dr. Philip Jenkins, the Diocese acted in accordance with the prevailing and generally accepted standard at all relevant times with respect to how it supervised O'Donnell.  (Diocese St. Fact ¶ 7).

ORDER - 19                                              19

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. United States Dept. of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1975).  Rather, the opposing party must come forward with specific facts showing that there is a genuine issue for trial.  *Id.* Summary judgment in an insurance coverage cases should be granted only where there is no dispute about the facts and coverage depends solely on the language of the policy. *Stouffer & Knight v. Continental Cas. Co.*, 96 Wash. App. 741, 747 (1999).

<u>INSURANCE CONTRACT INTERPRETATION</u>

The outcome of these motions depends upon the interpretation of comprehensive general liability insurance policies allegedly issued to the Diocese.  In a diversity action, a federal district court must apply the choice of law rules of the state in which it sits. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005).  In contract interpretation cases, Washington state courts generally apply the law of the state in which the contract was formed.  *Fed. Ins. Co. v. Scarsella Brothers, Inc.*, 931 F.2d 599, 603 (9th Cir. 1991).  There is no dispute that Washington state law is applicable here.

The interpretation of an insurance policy is a question of law.  *Overton v. Consol. Ins. Co.*, 145 Wash. 2d 417, 424 (2002).  The policy is interpreted as a whole with each term given a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance."  *Id.* (quoting *Sears v. Grange Ins. Ass'n*, 111 Wash. 2d 636, 638 (1988)).  Terms defined in a policy should be interpreted in accordance with their definitions, while undefined terms must receive their "plain, ordinary, and popular" meaning.  *Kitsap County v. Allstate Ins. Co.*, 136 Wash. 2d 567, 576 (1998).  Language in standard form policies is interpreted in accord with the understanding of the average purchaser, even if the insured is a large, sophisticated entity, with its own legal counsel.  *Queen City Farms, Inc. v. Cent'l Nat'l Ins. Co. of Omaha*, 126 Wash. 2d 50, 66 (1994).

ORDER - 21                                   21

In this regard, the Washington State Supreme Court recognizes that the average purchaser of a comprehensive general liability policy would expect broad coverage for liability arising from business operations. *Id.* at 78. Washington courts interpret comprehensive general liability policies in a fashion consistent with their label. Because comprehensive general liability policies are marketed by insurers as "comprehensive" in their scope, such a policy should be strictly construed when the insurer attempts to constrict its coverage. *Olds-Olympic, Inc. v. Commercial Union Ins. Co.*, 129 Wash. 2d 464, 471 (1996).

### DISCUSSION

The comprehensive general liability policies the Diocese allegedly purchased are occurrence-based policies and the insurers' duty to defend or indemnify the Diocese depends upon there being an "occurrence." Interpreting a materially similar occurrence-based policy to those at issue here, the Washington State Supreme Court has stated that the insured must prove the existence of the following three elements to recover under the policy:

> the plaintiff must have (1) sustained bodily injury, (2) an accident caused such bodily injury, and (3) the accident (including continuous or repeated exposure to conditions) resulted in bodily injury neither expected nor intended by the insured.

*EZ-Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wash. 2d 901, 906 (1986). Because a failure on any of these elements negates coverage, Oregon Auto and CNA's

ORDER - 22                                    22

motions are narrowly focused upon whether there was an "accident."   When undefined in an insurance policy, as it often is, Washington courts define the term "accident" as "an unusual, unexpected, and unforeseen happening." *Grange Ins. Co. v. Brosseau*, 113 Wash. 2d 91, 95 (1989);   *Allstate Ins. Co. v. Bauer*, 96 Wash. App. 11, 15 (1999).  This means that "an accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces or brings about the result of injury or death. The means as well as the result must be unforeseen, involuntary, unexpected and unusual." *Brosseau*, 113 Wash. 2d at 96.  As explained by the Washington State Supreme Court in *Detweiler v. J.C. Penney Cas. Ins. Co.*, 110 Wash. 2d 99, 105-06 (1988), this definition of "accident" is

> founded on the elemental proposition that injuries will not be deemed caused by accident where the injuries are intentionally inflicted, this generally being considered a risk which it would be against public policy to insure.  Thus, for example, the law will not countenance one intentionally shooting someone and then saying that since he or she did not intend to hurt the person shot, what happened was an "accident" covered by liability insurance.

Based on the foregoing, coverage has been routinely denied to insureds for their intentional acts as a matter of law, even when the harm was unintended.  *See, e.g., Safeco Ins. Co. of Am. v. Dotts*, 38 Wash. App. 382, 385-87 (1984) (finding no "accident" where the insured delivered a fatal backhanded blow to another man, even though the insured claimed to have intended no harm); *Unigard Mut. Ins. Co. v. Spokane Sch. Dist. 81*, 20

ORDER - 23                                          23

Wash. App. 261, 264-65 (1978) (holding that a young boy's intentional act of starting a fire, which cause damage to a school, was not an "accident" despite the boy's contention that he did not intend the damage).

Unremarkably, courts have held likewise in cases involving sexual abuse or sexual assault. *See, e.g., W. Nat'l Assurance Co. v. Hecker*, 43 Wash. App. 816, 822-23 (1986) (holding that the insured's deliberate act of intercourse with another was not an accident after finding that the insured specifically intended the act); *Grange Ins. Ass'n v. Authier*, 45 Wash. App. 383, 386-87 (1986) (holding that the taking of indecent liberties with a minor was not an "accident" even though the insured claimed to have intended no harm). In fact, in cases involving sexual abuse, Washington State courts will infer the intent to inflict harm as a matter of law, regardless of the abuser's actual subjective intent. *See Rodriguez v. Williams*, 107 Wash. 2d 381, 387 (1986) (holding "that the insured intends harm as a matter of law when he commits incest").

This court recognizes, and the Diocese concedes, as perpetrators of intentional acts of abuse, the individual priests are not entitled to coverage. The issue raised by these motions, therefore, is solely whether the Diocese can establish the existence of an "accident" for claims it acted negligently in hiring, supervising, and retaining the priests at issue, including O'Donnell.

**I. Oregon Auto's Motion for Summary Judgment Based on No "Accident"**

ORDER - 24                                    24

Oregon Auto argues that the "accident" must be viewed objectively and if the direct cause of harm is not an "accident" from the standpoint of the perpetrator, there is no coverage for the co-insured Diocese.  It is Oregon Auto's position that in *Safeco Insurance Company of America v. Butler*, 118 Wash. 2d 383 (1992), the Washington State Supreme Court replaced a line of reasoning and application that began in *Unigard Mut. Ins. Co. v. Spokane Sch. Dist No. 81*, 20 Wash. App. 261 (1978).  *Unigard* involved an undisclosed type of occurrence-based insurance policy, presumably a homeowner's policy, that was issued by Unigard to Ruth Hensley as the named insured.  The policy defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the endorsement term, in bodily injury or property damage."  *Id.* at 262.  It also included an exclusion clause, which provided that "[t]his policy does not apply . . . to bodily injury or property damage which is either expected or intended from the standpoint of the insured."  *Id.* at 262.  It was undisputed that both the parents and their son were "insureds" within the meaning of the policy.  *Id.* at 263.

The action arose when the school district filed suit against an 11-year old boy for starting a fire at school that caused extensive damage to the building and joined his parents for negligently failing to supervise and control him.  *Id.* at 261-63.  The court held that Unigard had no duty to defend or indemnify the boy because his actions were intentional and therefore not an "accident."  However, the insurance company had a

separate duty to defend and indemnify his parents.  In so holding, the court reasoned that

> [t]he policy extends defense and indemnification to "the Insured," and it
> excludes from coverage intentional acts resulting in injury or damage
> "expected or intended from the standpoint of the insured." The parties
> concede the boy and the Hensleys are all "insureds" under the policy. In
> such instances, where coverage and exclusion is defined in terms of "the
> insured," the courts have uniformly considered the contract between the
> insurer and several insureds to be separable, rather than joint, i.e., there are
> separate contracts with each of the insureds. The result is that an excluded
> act of one insured does not bar coverage for additional insureds who have
> not engaged in the excluded conduct.

*Id.* at 265-66.

This reasoning was then applied by the Washington State Supreme Court in

*Federated Am. Ins. Co. v. Strong*, 102 Wash. 2d 665 (1984).  In *Strong*, Clyde Strong, the

owner of a Oldsmobile Toronado, had automobile liability and collision coverage through

Federated American Insurance Company.  The policy covered "accidental loss" but

included an exclusion for "bodily injury or property damage caused intentionally by or at

the direction of the insured."  *Id.* at 70-74.  The case was a declaratory judgment action,

brought to determine whether Clyde Strong's insurance policy provided coverage for

automobile collisions caused by Lisa Strong, Clyde's estranged wife, after she

intentionally drove his car into two other vehicles.  Applying the *Unigard* reasoning

quoted above, the court held that because the policy's coverage and exclusions were

defined in terms of "the insured," as in *Strong*, there were separate contracts between the

insurance company and each spouse.  Therefore, the excluded act of Lisa Strong did not

bar coverage for her husband.  *Id.* at 71.

Oregon Auto relies upon *Butler*, which involved a homeowner's insurance policy that provided coverage for "bodily injury . . . caused by an occurrence . . ." where an occurrence was "an accident . . . which results, during the policy period, in bodily injury."  *Butler*, 118 Wash. 2d at 400. The policy was issued by Safeco Insurance and held by Hap and Geraldine Butler, as co-insureds.  Hap Butler became involved in an altercation with the occupants of another vehicle and, as a result, it was undisputed that he intentionally fired his gun at their truck and injured one of the occupants.  *Id.* at 385-86.  Safeco argued that as a matter of law, the injury could not be accidental because the shots were fired intentionally.  Hap claimed that he "did not intend to shoot or injure [the passengers], and did not foresee that his shot would cause injury."  *Id.*  The court held that the injury did not result from an "accident" because Hap's shooting was intentional and the alleged ricochet which caused the injury was foreseeable.  Consequently, Safeco had no obligation to provide coverage.  *Id.*

Relying on *Strong*, the Butlers argued that even if there was no coverage for Hap, there should be coverage for Geraldine because the excluded act of one insured does not prevent the other insured from recovering under the policy. In rejecting Geraldine's claim to coverage, the *Butler* court stated that

> the holding in *Strong* that whether an event is an accident is determined from
> the point of view of the insured . . . was overruled *sub silentio* in *Roller v.*

*Stonewall Ins. Co.*, 115 Wash.2d 679, 801 P.2d 207 (1990). In *Roller*, we
unanimously held "accident" is not a subjective term. Thus, the perspective
of the insured as opposed to the tortfeasor is not a relevant inquiry. Either an
incident is an accident or it is not . . . In a footnote, we went on to
specifically reject the view that "whether an intentional act is an 'accident'
should be viewed from the perspective of the insured." . . . Thus, the holding
of *Roller* is that whether an event is an accident does not depend on the view
of the insured.

*Id.* at 403.  In doing so, however, the court focused on the term "accident" without

reference to the term "occurrence," perhaps because the coverage language was not

defined in terms of "the insured."  Because the court held that the injury was not a result

of an "accident," it never addressed the policy's exclusion clause, which denied coverage

for any bodily injury "expected or intended by any insured or which is the foreseeable

result of an act or omission intended by the insured."  *Id.* at 402.

    While the court in *Butler* claims that *Roller* overruled *Strong sub silentio*, the

*Roller* court in fact only stated that it was distinguishing its case from *Strong*.  *Roller*, 115

Wash.2d at 684.  In *Roller*, Daniel Roller was run down by his ex-wife shortly after

exiting Earnest Flattum's car, having received a ride.  As neither he nor his wife carried

insurance, Roller made a claim against Stonewall Insurance Company under Flattum's

underinsured motorist (hereinafter "UIM") coverage.  *Id.* at 681-82.  The UIM policy

provided coverage for "damages for bodily injury . . . which an insured person is legally

entitled to recover from the owner or operator of an underinsured motor vehicle.  Bodily

injury . . . must be caused by accident and arise out of the ownership, maintenance or use

ORDER - 28                                          28

of the underinsured motor vehicle." *Id.* at 683.  Essentially, Roller was attempting to gain

coverage under another's underinsured motorist (hereinafter "UIM") policy for injuries

caused by a third party.  While the court did use the language that is quoted in *Butler*, it

did so while dismissing the subjective expectation of the injured UIM claimant as

irrelevant:

> Because the Stonewall policy does not define "accident", the term must be
> given its popular and ordinary meaning . . . This court has determined that
> "[a] loss is 'accidental' when it happens without design, intent, or obvious
> motivation." . . .On the basis of this common sense definition, this court has
> determined that an intentional act can never be an "accident". . .Furthermore,
> pursuant to the common sense definition, "accident" is not a subjective term.
> Thus, the perspective of the insured as opposed to the tortfeasor is not a
> relevant inquiry. Either an incident is an accident or it is not. McKay's
> intentional ramming of Roller was not an accident.

*Id.* at 684-85.

Oregon Auto relies heavily on the language taken from *Butler* and *Roller* that

states:

> "accident" is not a subjective term. Thus, the perspective of the insured as
> opposed to the tortfeasor is not a relevant inquiry. Either an incident is an
> accident or it is not.

Oregon Auto asserts that it is dispositive on the issue of insurance coverage for the claims

asserted by the Diocese because it is the perpetrator priests' deliberate sexual abuse that

is the injury-causing event that must be viewed objectively and as such, there is no

"accident," regardless of how the underlying tort claim is characterized.  Oregon Auto

ORDER - 29                                   29

disregards the fact that the claims against the Diocese are based upon alleged negligent hiring, supervision, and retention, not an intentional wrong of direct sexual abuse.

This court notes, however, that even when Washington courts interpret insurance policies with the same language, the court's interpretation may vary from prior judicial holdings depending on:

> (1) whether the language is set forth in an inclusionary section granting coverage or an exclusion to that coverage, and/or (2) whether the policy being reviewed provides the same type of insurance as the policy that has previously been reviewed.

Thomas V. Harris, WASHINGTON INSURANCE LAW, § 21-2 (1995).  As for the first factor, inclusionary clauses are interpreted liberally to provide coverage whenever possible and exclusionary clauses are construed strictly against the insurer.  *Port of Seattle v. Lexington Ins. Co.*, 111 Wash. App. 901, 908 (2002).  As for the latter factor, "the courts have indicated that they will not always interpret a term in a comprehensive general liability policy in the same fashion that the identical term will be interpreted in a different type of liability policy."  Thomas V. Harris, WASHINGTON INSURANCE LAW, § 21-2 (1995).  For example, it is recognized that "[t]he definition of 'accident' for the purpose of auto insurance is quite different from the definition of 'occurrence' for the purpose of comprehensive general liability insurance ."  *Queen City Farms, Inc. v. Cent'l Nat'l Ins. Co. of Ohama*, 64 Wash. App. 838, 866 (1992), *aff'd in part, rev'd in part* 126 Wash. 2d 50 (1994).

ORDER - 30                                         30

*Roller* and *Butler* are not factually analogous to the present case.   The Diocese is an insured seeking coverage for its own alleged tortious actions – negligent supervision, hiring, or retention of an employee – not an innocent non-tortfeasor seeking coverage for the intentional acts of a co-insured.  Moreover, *Roller* and *Butler* involved substantially different insurance policies than the policies at issue here.  *Roller* involved a UIM policy and *Butler* involved a homeowner's policy, rather than a comprehensive general liability policy.  Also, the Diocese's alleged policies define the coverage in terms of what is "neither expected nor intended from the standpoint of the insured," language that is not present in the *Roller* policy and is materially different from *Butler's* exclusionary clause language, which denied coverage  for any bodily injury "expected or intended by *any* insured or which is the foreseeable result of an act or omission intended by the insured." (emphasis added).

Thomas V. Harris, in WASHINGTON INSURANCE LAW § 34-2 (1995), explains that the *Butler* and *Roller* decisions may be attributable to the specific policy and policy language at issue in those cases.  UIM coverage, like the type at issue in *Roller*, "is substantially different than liability coverage because the insured is the victim, and not the cause, of the injurious event.  As a result, the coverage grant in a UIM policy does not focus on whether an injury-causing event was expected or intended by an injured insured." *Id.*  Then, he explains the holding in *Butler* by stating that "[t]he coverage

section in most liability policies limits coverage to damages that are caused by an accident, and are neither expected nor intended by the insured.  However, when the coverage section of a liability policy does not define its focus as being the viewpoint of the insured, the court will apply the same interpretative focus as it does in UIM cases." *Id.*

Therefore, although Oregon Auto argues that *Unigard* was overruled because the court in *Butler* stated that *Roller* overruled *Strong* which adopted *Unigard's* reasoning, *Unigard* may still be good law.  In fact, as recently as 2003, the Washington State Court of Appeals, Division 1, cited *Unigard* for the proposition that where coverage and exclusion is defined in terms of "the insured," each insured is entitled to read the policy as if applying only to that insured.  *Truck Ins. Exchange v. BRE Properties, Inc.*, 119 Wash. App. 582, 591 (2003).

Moreover, Washington courts seem to differentiate between exclusionary clauses written in terms of the "*the* insured" and similar clauses written in terms of "*an* insured". *Allstate Ins. Co. v. Raynor*, 93 Wash. App. 484, 498 (1999).  It appears that when coverage and exclusionary clauses are written to broadly exclude coverage for all intentionally caused injury or damage by *an* or *any* insured, the exclusion may not be restricted to intentional acts of the particular insured sought to be held liable.  *Farmers Ins. Co. of Wash. v. Hembree*, 54 Wash. App. 195, 200 (1989); *U.S.F. & G. Ins. Co. v.*

*Brannan*, 22 Wash. App. 341, 348 (1979).  When those clauses refer to "*the* insured," as is the apparent case herein,  coverage is only precluded when, in fact, the act proximately causing the injury was the direct and intentional wrongful act of the named insured seeking coverage, in this case, the Spokane Diocese.  There is no contention that the Diocese's acts were other than negligent.

As the Washington Supreme Court has noted concerning insurance policies and exclusions, "The industry knows how to protect itself and it knows how to write exclusions and conditions."  *Boeing v. Aetna Cas. and Sur. Co.*, 113 Wash. 2d 869, 887 (1990); *Panorama Village Condominium Owners Ass'n. Board of Directors v. Allstate*, 144 Wash. 2d 130, 141 (2001). It appears that after the nationwide carriers became aware of the numerous claims against Dioceses, and after the claims at issue herein, the carriers changed their comprehensive liability policies to exclude any such claims, be they of negligent or intentional conduct, and whether the intentional wrongful or negligent acts were by the insured or by a person also insured under the policy.

Due to an apparent dearth of Washington state case law regarding occurrence-based comprehensive general liability policies, much less cases involving similar factual situations, this court must attempt to predict how the Washington State Supreme Court would interpret state law in this case.  *Dias v. Elique*, 436 F.3d 1125, 1129 (9th Cir. 2006).  In doing so, this court may use decisions from other jurisdictions. *S.D. Myers,*

ORDER - 33                                   33

*Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001).  Outside of Washington, jurisdictions are split over whether there is an "occurrence" under a commercial general liability policy when claims for negligent supervision, hiring, or retention are made against an employer and the underlying injury is caused by the intentional act of an employee.  *See* 9A Steven Plitt, et al., COUCH ON INSURANCE, § 129:4 (3d ed. 2005);  2 Allan D. Windt, INSURANCE CLAIMS AND DISPUTES § 11:3 (4th ed. 2001).

Some jurisdictions focus on the conduct causing the injury and hold that where it is the employee's intentional act which causes injury, a claim for negligence against the employer is not an "occurrence" because the underlying act is not an "accident."  *See, e.g., Sears, Roebuck and Co. v. Nat'l Union*, 772 N.E. 2d 247, 256 (Ill. App. Ct. 2002) (finding that because the victim's complaint alleged that the employee's sexual assault that caused the bodily injury was intentional, there was no "occurrence" within the meaning of the policy, meaning the insurer had no duty to defend or indemnify Sears even though the complaint also alleged that the conduct causing the bodily harm was attributable to Sears' negligence);  *Sweet Home Cent. Sch. Dist. of Amherst and Tonawanda v. Aetna*, 263 A.D.2d 949, 949 (N.Y. App. Div. 1999) (affirming that insurer had no duty to defend or indemnify plaintiff school district because it is the nature of the underlying acts – assault and sexual abuse by a teacher – not the theory of liability –

negligent hiring, retention, and supervision – that governs that occurrence-based policy); *SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 181 F.3d 1210, 1214-17 (11th Cir. 1999) (holding, under Georgia law, that allegations of intentional sexual harassment, assault, battery against a manager, which form the basis for claims of negligent retention against the employer, are not "accidents" and therefore do no constitute an "occurrence," as defined by an occurrence-based comprehensive general liability policy).

Other jurisdictions, and in this court's opinion, the better reasoned cases, hold that the negligence of the employer does constitute an occurrence, based upon the desire to maintain "the conceptual separation between the intent of the employee and the employer." *Great N. Ins. Co. v. Paino Assoc.*, 369 F. Supp. 2d 177, 188 (D. Mass. 2005); *see also Diocese of Winona v. Interstate Fire & Cas. Co.*, 858 F. Supp. 1407, 1415 (D. Minn. 1994)(stating that "a refusal to treat the employer's negligent supervision as separate from the employee's intentional conduct is an unduly restrictive interpretation" of a similar occurrence-based policy) *rev'd in part on other grounds* 89 F.3d 1386 (8th Cir. 1996).

The Sixth Circuit, in *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 509-10 (2003) (citing *U.S. Fid. & Guar. Co. V. Open Sesame Child Care Ctr.*, 819 F. Supp. 756, 760 (N.D. Ill. 1993)), cautioned against confusing the evaluation of an employee's intentional conduct and the employer's negligent conduct. The court explained that by

ORDER - 35                                    35

not separating the employer's alleged negligence from the employee's intentional

conduct, other courts "impermissibly ignored the employer's independent acts which gave

rise to the alleged tort . . .[and by] holding that the employee's intentional conduct places

the insured's negligence outside the definition of "occurrence," . . . courts read the

exclusion too broadly." *Id.* at 509 (quoting *Open Sesame Child Care*, 819 F. Supp. at

760).  To avoid transforming the employer's negligent acts into intentional acts, thereby

dissolving the distinction between negligent and intentional conduct, the court decided to

"look to the actions of the insured and not the perpetrator of the intentional act in

determining whether there is coverage" for alleged acts of negligent hiring and retention.

*Id.* at 510 (quoting 14 COUCH ON INSURANCE 3d § 201:18 (1999)).

The Texas State Supreme Court held likewise in *King v. Dallas Fire Ins. Co.*, 85

S.W. 3d 185 (Tex. 2002).  In *King*, Greg Jankowiak sued Carlyle King for negligent

hiring, training, and supervision, after being attacked by one of King's employees.  King

held an occurrence-based policy with Dallas Fire Insurance Company where he and his

employees were insureds.  An occurrence under the policy was limited to an "accident"

and it included a separation of insureds clause and an exclusion clause for damages or

injuries "expected or intended from the standpoint of the insured."  *Id.* at 188.  The court

concluded that imputing the intent of the employee upon the employer, such that there is

no "occurrence," ignores the separation of insureds clause and the intended-injury

ORDER - 36                                36

exclusion provision.  The court reasoned that the intended-injury exclusion clause, which excluded coverage for injuries "intended from the standpoint of the insured," would have no purpose if all intended injuries were excluded at the outset from coverage because they would not be an 'occurrence.'" *Id.* at 189.  The court concluded that, under Texas law, "whether one who contributes to an injury is negligent is an inquiry independent from whether another who directly causes the injury acted intentionally.  Essentially, the actor's intent is not imputed to the insured in determining whether there was an occurrence." *Id.* at 191-92.

The Eighth Circuit, in *Am. Employers Ins. Co. v. Doe*, 165 F.3d 1209 (8th Cir. 1999), a case which is almost perfectly analogous to this one, was persuaded by *Mork Clinic v. Fireman's Fund Ins. Co.*, 575 N.W. 2d 598 (Minn. App. 1998) and held that under Minnesota law the Diocese of New Ulm and the Church of St. Joseph were entitled to indemnification under an occurrence-based policy for claims of negligent employment and supervision of a priest who allegedly perpetrated sexual abuse.  The court reasoned that because "the immediate cause of the victims' injuries is not the only cause, and the victims had a legitimate cause of action against the employer . . . [t]he injuries would not have occurred if [the employer] had not hired the employee and offered him as its agent . . . to the victims"). *Id.* at 1212.

Although not urged by the Diocese, this court notes that the Eighth Circuit's

ORDER - 37                          37

reasoning in *Am. Employers Ins. Co.* is similar to the so-called "efficient proximate cause rule," adopted by the Washington State Supreme Court, in 1983:

> Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought, the insured peril is regarded as the "proximate cause" of the entire loss.
> It is the efficient or predominant cause which sets into motion the chain of events producing the loss which is regarded as the proximate cause, not necessarily the last act in a chain of events.

*Raynor*, 143 Wash. 2d 469, 479 (quoting *Graham v. Public Employees Mut. Ins. Co.*, 98 Wash. 2d 533, 538 (1993)).  Even though some of the perils contributing to the loss may be excluded, the insured peril is the proximate cause of the entire loss, so the loss is covered.  *Kish v. Ins. Co. of N. Am.*, 125 Wash. 2d 164, 170 (1994).

Although this issue has resulted in a split of authority among states, this court is persuaded by the jurisdictions that maintain a conceptual separation between the intent of the employee and the intent of the employer, especially because the Diocese's alleged policies' coverage language is defined in terms of "*the* insured," rather than "*an* insured" or "*any* insured."  Washington courts read "*the* insured" to act like a separability clause, directing that the policy be construed as applying to each insured.  Also, because Washington courts strictly construe comprehensive general liability policies when insurers attempt to constrict coverage, this court refuses to extend *Roller* and *Butler* beyond their particular facts and different policies to preclude comprehensive general

ORDER - 38                                          38

liability coverage for the Diocese as a matter of law. Based on the foregoing, Oregon Auto's Motion For Summary Judgment Based On No "Accident" (Ct. Rec. 138) is **DENIED.**

**II. Pacific Insurance Company's Motion for Partial Summary Judgment on All Child Sexual Abuse Claims Against the Diocese of Spokane Involving Patrick O'Donnell Based on No "Accident**

In its motion for partial summary judgment, CNA adopts Oregon Auto's argument that the holdings in *Roller* and *Butler* require viewing "accident" objectively, but frames it argument in terms of the Diocese's conduct. For the purpose of its motion, CNA acknowledges that the Diocese's liability to sex abuse victims derives from injury caused by the Diocese's alleged negligent hiring, retention, and supervision of abusive priests. CNA argues that as a matter of law, the Diocese's supervisory conduct relating to Patrick O'Donnell, such as his assignment and reassignment to youth work in parishes without restriction or disclosure to parishioners, was not an "accident" because it was deliberate and intentional, and the resulting abuse was objectively foreseeable. CNA does not argue that the Diocese intended for O'Donnell to cause the harm.

CNA emphasizes the fact that Washington court define "accident" as "an unusual, unexpected, and unforeseen happening," and that "an accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces or brings about the result of injury or death.

ORDER - 39                    39

The means as well as the result must be unforeseen, involuntary, unexpected and unusual." *Brosseau*, 113 Wash. 2d at 95-96 (quoting *Unigard*, 20 Wash. App. at 263-64).

CNA's argument, which attempts to characterize the Diocese's supervisory conduct relating to O'Donnell as deliberate and intentional and therefore not an "accident" is not persuasive. The claims being brought against the Diocese allege negligence and there is no doubt that acts of negligence can be accidental and constitute "occurrences." *See Yakima Cement Prods Co. v. Great Am. Ins. Co*, 93 Wash. 2d 210, 215 (1980) (stating that within the context of a products liability policy, coverage would be rendered meaningless if coverage did not extend to the deliberate manufacture of a product which inadvertently is mismanufactured, leading to property damage); *Queen City Farms, Inc.*, 126 Wash. 2d at 66 (stating that "[t]he average purchaser of insurance would understand that the policy language provides coverage for damage resulting from most acts of ordinary negligence"). In *Queen City Farms*, one of the reasons cited by the Washington State Supreme Court in holding that the subjective standard applies for the expectation of the resulting harm in an occurrence-based policy was the fact that the average purchaser of insurance would understand occurrence-based policies to cover harms resulting from acts of negligence, even though precipitated by an intentional act.

> . . . the average purchaser of insurance would understand that the policy language provides for coverage for damage resulting from most acts of

ORDER - 40                                        40

ordinary negligence.  As the Court of Appeals in this case recognized, an objective standard is inconsistent with insurance coverage for damage resulting from ordinary negligence. Thus, the driver who intentionally backs a car up, but does so negligently into the path of a vehicle having the right of way, has acted intentionally in a manner where it can be said that objectively an accident may occur. The average purchaser of insurance would reasonably understand from the policy language that coverage was provided under the occurrence clause.

*Id.* at 66.

The performing of intentional acts does not mean that every such act that results in injury to another is an "intentional" excluded act under a comprehensive liability insurance policy.  Clearly, a covered person intentionally striking a golf ball with the intention that it land on its assigned fairway or green, but which sharply diverts from its intended course and strikes a player on an adjacent fairway, does not mean that the intended launching of the golf ball excludes coverage for any negligence involved in failing to warn the adjacent players with a time honored (and expected) "fore!!!."

The Washington State Supreme Court recognized, as this court does, that nearly all acts of negligence can be described in terms of deliberate acts, but doing so does not negate coverage.  CNA does not argue that the Diocese, as the insured, intended the acts giving rise to liability and the Diocese faces allegations of negligence based upon intentional acts or failure to act after alleged complaints concerning O'Donnell.  The issue that is left for another day, is whether the Diocese, at some point during these policy periods, expected the sexual abuse, within the terms of the policies.  Accordingly,

ORDER - 41                                    41

Plaintiff Pacific Insurance Company's Motion for Partial Summary Judgment on All Child Sexual Abuse Claims Against the Diocese of Spokane Involving Patrick O'Donnell Based on No "Accident (Ct. Rec. 155) is **DENIED**.

**IT IS HEREBY ORDERED:**

1.  Cross-Defendant Oregon Auto's Motion For Summary Judgment Based On No "Accident" is **DENIED.**  (Ct. Rec. 138).

2.  Plaintiff Pacific Insurance Company's Motion for Partial Summary Judgment on All Child Sexual Abuse Claims Against the Diocese of Spokane Involving Patrick O'Donnell Based on No "Accident" is **DENIED.**  (Ct. Rec. 155).

**IT IS SO ORDERED.**  The Clerk of this court shall enter this Order and forward copies to counsel.

**DATED** this 24th day of April, 2006.

s/ Justin L. Quackenbush<br>
JUSTIN L. QUACKENBUSH<br>
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 42                                          42